and Appellant Cross Appellant by Stanley Tucker and Jennifer Woodrum, Appellant Cross Appellate by Emily Sutton. Please proceed. May it please the Court, Counsel, my name is Emily Sutton and I represent the appellant Jennifer Woodrum. The primary issue that we're here on today is the unconscionability and enforceability of a prenuptial agreement. The Court's review of this issue is de novo, except as it relates to any findings of fact, which is whether the findings of fact are against the manifest weight of the evidence. As the Court is that a premarital agreement is unenforceable if the agreement was unconscionable when it was executed and before the execution of the agreement, the party was not provided a fair and reasonable disclosure of the other's property, the party did not waive the right to such disclosure in writing, and the party did not and could not have reasonably had an adequate knowledge of the other's property. I'd like to begin with the second half of that provision and move on to unconscionability in just a moment. First, it's clear that Mrs. Woodrum was not provided a fair and reasonable disclosure of Mr. Woodrum's property. Exhibit A to the prenuptial agreement purports to be Greg's property disclosure. The Court had ample evidence before it, the trial court had ample evidence before it, that Mr. Woodrum had significant assets prior to the marriage that were not disclosed on that document or in any other manner prior to the marriage. The evidence in the trial court showed that Mr. Woodrum had a 20% ownership interest in not one, but two Woodrum business entities at the time that the prenuptial agreement was signed. He testified, Mr. Woodrum testified that he had a 20% ownership interest in Wayne Woodrum Inc. since the 1980s or 90s. That interest was later sold during the marriage, 2014, for $350,000. So we're not talking about a car, we're talking about a car dealership, which was doing very well. So, given the fact that, how does that render the prenup unconscionable? Well, the interest was not disclosed. Well, and I guess that, my question is so what? How does that shock anybody's conscience that two people getting married and one doesn't know how much the other one has? Well, the act itself provides for a fair and reasonable disclosure of property. And there wasn't a fair and reasonable disclosure. The disclosure was full of omissions and inadequate information. The agreement itself provided that they were giving each other a fair and reasonable disclosure. And in fact, Mrs. Woodrum's disclosure was quite detailed and even included her cat. Mr. Woodrum listed apparently what he could think of off the top of his head, but left off the fact that he had 20% interest in his family business. Two, 20%. What was the name of the family business? There were two family businesses. At one point it was Wayne Woodrum Incorporated. Apparently, at the same time, there also was Woodrum Automotive Inc. interest. Where was that located? It's in Macomb, Illinois. Okay, not Chicago. Correct. So, she had no idea that this Woodrum car dealership was somehow related to her husband? She knew that her husband had some involvement in the family business, but he paid all the bills. You see on his financial disclosure that apparently the business must have been paying some of the bills. There's no indication on his financial affidavit that he paid for basic things like No, but it just shows that she did not have the knowledge of the financial situation. And apparently he didn't either. He testified at length that, well, I don't know what I had. I can't explain what these entries are on my tax returns. You'd have to ask the accountant. And if he didn't know, how could he tell her? So, that would be good evidence of her lack of knowledge. If Mr. Woodrum didn't know, then Mrs. Woodrum clearly couldn't know. As I mentioned, we have the 2007 tax returns admitted into evidence that indicate a whole host of income generating assets that were not listed on the disclosure. So, had she known all those things, she wouldn't have married him? I think if she had known all those things and had her attorney known all those things, it would have made a difference in what she might have agreed to. As it stood, he was managing the car dealership and they lived in a fairly nice house. But, when you look at, he apparently had investment accounts worth what we don't know. You know, if you compare what she had at the time to what he had at the time on paper and what was actually disclosed, it doesn't look outrageous. When you find out that in 2014 he sold a 20% interest in the property, it makes things look a lot different. And frankly, that's what the law calls for, is the reasonable disclosure. And he signed a document saying that he was giving a full and reasonable disclosure of his property. The law also says that you have to waive that right to disclosure in writing. It is in the writing, the prenuptial agreement itself, that she did not waive that. So, I think she's satisfied all of those three prongs in the law. Before the execution of the agreement, the party was not provided a full and fair disclosure of the other's property. She didn't waive that disclosure in writing. And she did not have and could not have an adequate knowledge of his property. Which then brings us to the issue of unconscionability. Now, this court knows that there are two types of unconscionability, and that's either procedural or substantive. And we can even look at a mixture of those two to determine whether there was unconscionability. And that is the trial court's decision was a matter of law, so again your review would be de novo. Was the substance of the agreement unconscionable given the circumstances at the time? So in 2007, Mrs. Woodrum had an income from her insurance selling business. She was an agent for Aflac and had traveled prior to her relationship with Mr. Woodrum that had decreased over time. Her income in 2007 was around $7,000. She didn't have an LLC, real property. She had investments of right around $50,000. Her car was half owned by Mr. Woodrum. So that's her financial picture. She's 51, she has a been dismissed from her house that she has shared with her husband for 14 years due to a disagreement about religion and basically said, sorry, we're done and let's look at this prenuptial agreement. You get no maintenance, you get no property, and now at 61 you've got to survive on your Social Security of $415 and whatever investments that you had. So it's manifestly unconscionable. The substance of it itself, and again if we look at the difference in the situation as disclosed versus the actual financial situation, that illustrates that it was substantively unconscionable. We believe that there's some $15,000 a year. So in other words, and I realize that the law is what it is, but is this a marriage or is she buying an income generating asset? Is that the point? She's no worse off for the marriage than she would be had she not gotten married, is she? Well presumably she would have continued to work. She wouldn't have spent the last 10 years, she wouldn't be at 61 completely. Did she quit her job when she got married? She had tapered off over the course of the relationship. Mr. Woodrum likes to travel and that was something that he wanted to do with her, so she ran the household and her job had required quite a bit of travel herself, which was not convenient to the relationship. So over the course of the relationship, they began their relationship in 2001, and by 2007 when they had entered into the marriage, her income had dropped and she was financially reliant on him by the time they were about to get married. I don't think anybody could say we could get along on $7,000 a year, which is what her income was at the time she signed the prenuptial agreement. So she had lived with him, cohabitated with him, and he basically supported her without a marriage. Correct. So if they hadn't married, that relationship may have continued and it doesn't require her to make a substantial income. It may have, but then she would have been on notice that she was giving up the ability to have those protections. How does the seven-year relationship work towards the knowledge element here? Because she was living in the same household with him for seven years and I presume was aware of some of his interests due to that relationship. Well, she testified that he took care of all the financial matters. He paid the bills, and so she didn't have a reason to know about any of his interests. And they weren't married, so he had no obligation to disclose those until it I would just like to briefly hit on our tangential issue, which was the summary entry of the dissolution of marriage without having had the opportunity to do any additional We know that there was a jointly-owned car at some point. We haven't had an opportunity to explore what happened to those proceeds or where Ms. Woodrum might be entitled to some credit for those sorts of assets that were not subject to the prenuptial agreement. I believe it's appellee's position that there weren't any, but there had to have been because she disclosed this joint interest in a checking account, this joint interest in a car, and that has not been addressed. And so for that reason alone, we believe that the matter should be remanded to the trial court to make those determinations once counsel has opportunity to fully conduct discovery on those issues. Thank you. If the court please. I'd like to start out this morning with a question the court has sort of already touched on. And we've tried to kind of flush out the logic of what it is that the appellant is claiming here. And can I interrupt for a second? Yes. What property specifically has been talked about? I'm not clear on that. Specifically, what is the property in the record that's being referred to? Well, Your Honor, we don't think there is anything further to do. Actually, Judge Ponson, give me a second here. We don't think there's a premature conclusion. The case is over. There's nothing further to do. The premarital agreement really covered everything. At that time, at the time of entry of judgment, Judge Ponson said, What property is marital property that is in dispute? He said this petition was filed in September 15. There's been extensive discovery. Financial matters were disclosed. And then he said to counsel, As you sit there today, what property is marital property that is in dispute? And counsel's answer at 184 was, There hasn't been significant. We did discovery. And so even at that time, appellant could not tell the court what there was to do that was left to do. And the judge entered the judgment. And this morning, I don't recall hearing what there was left to do. I think what counsel said there was left to do, there was marital property, including a joint checking account and a jointly owned vehicle. That may not be all, but there's an example. What about the others? We don't think that's the case, your honor. And there wasn't any evidence about it. And she had an opportunity to tell Judge Ponson that right there when the draw was happening and they didn't. And so that was their opportunity. There was nothing else to do so far as we were concerned or so far as the judge was concerned. And I'll ask counsel that when she comes back up. Is there any evidence in the record of the existence of a jointly held automobile? Because you referred to that as like in the past. And is there any evidence? Not that I know of, your honor. Not that I know of. And we're, you know, we are somewhat familiar with the record. This is not a big record. And so I don't think there's anything in there. Maybe counsel can give us a case number. I don't know. But to go back to my first premise, we were thinking, is the logic of the claim here that she would not have married him if she had known he was more wealthy than he had disclosed? Would she not have married him? Would she not have signed the agreement? What's what's the problem? You know, if you fail to disclose a $40,000 MasterCard, certainly she could have been upset. But then when you move on into the case, her claim was that she had not read the agreement. And Judge Ponson said, well, look, if she didn't take the opportunity to read it, then she cannot later plead lack of understanding or that she was misled. And so the only significant part of this disclosure business is whatever it is he owned in the business which his father had operated for many decades. And in thinking about that, you know, they were together six years. And here the appellant is saying, well, I didn't know he owned any of Wood, but let's let's think about that. In that six years before the marriage, he came home from work more than 1,200 times. And it is just incredible to me, and I think it was to Judge Ponson, that she could not possibly have known that. And we actually get into that in the evidence. This this flap about not disclosing the dealership. Sure, it wasn't on Exhibit B or A, whichever one it was. And so. But Judge Ponson pointed out in his summary, which we included with our brief in the vicinity of page 161, he pointed out that in the direct examination, Jennifer testified that, well, I didn't know about the dealership. But then in the cross-examination, Ponson points out when when her deposition was presented to her. Well, I didn't know he owned part of the dealership. So this whole thing is a is a dissension. At 165, Ponson points out that issue and says, well, she said she didn't know. She didn't know. And he points out that that affects the credibility of her testimony. And it's it's a classic credibility problem, which, of course, is the problems of the judge. And so the standard that counsel has proposed under the. What was it, the Galesburg Carthage Hospital case? I can't recall. But the standard that cited there is is a standard of de novo about interpretation of law or of a statute, as I recall it. And we think that in this case, we have to talk about a standard or manifest way to the evidence. And we said that and we know that this court will not substitute its judgment for Judge Ponson's judgment on the credibility of witnesses and the weight to be given the evidence. And so even even if you say that the evidence is controversial here, the judge made his decision. And unless you can say that no reasonable person would do that, you know, under the rules, we ought to leave it alone in this court. We think the disclosure was reasonable. And we want to point out. I have some language here that I'm very, very proud of and want to read to the court about the specificity of the disclosure. This is not a financial affidavit. And we want to say, do not be beguiled by the subliminal references in Appellant's brief about the detail of disclosure and talking about a financial affidavit. This is not a financial affidavit in a divorce case involving children or custody or whatever. This is a disclosure which is attached to a prenuptial agreement. It is not a Ph.D. thesis. Even Appellant agrees at page twenty three of their brief that Greg really didn't know. Dan or Appellant, for that matter, and the accountant testified to that. So we don't disagree that there's any unconscionability, either procedural or substantive. Or the substantive thing we see language like improbable, improvident, totally one sided, oppressive. And we didn't get anything out of this agreement that Appellant didn't get. All dues and obligations applying to both parties. And they leave the marriage with what they came into it with. And how you can say that this is that this is unfair or substantively unconscionable seems remote. And so we covered the premature conclusion in our brief. We cross appeal for a refund of the temporary maintenance based on the language of the agreement. We're not going to comment further on that this morning. The Appellant did not file a responsive brief to our cross appeal. So we're not going to argue that. It's covered in our brief. In summary, we think that the agreement is not inherently unconscionable or in any other way. And we come into a reading of Judge Ponson's ruling at R163 to 172 of the record where he covers it all. He goes step by step and he ruled on every one of these matters. And they haven't shown that any of his rulings are beyond the manifest rules. Thank you very much. Any questions? I do have a question. You said he had come home from work. How many times in the seven years? Well, in six years. And if we work 200 days a year, some of us. Some work less. Work less. Yeah, that's what I was going to say. Anyway, it's 1,200 times he came home from work. So how would she know that he came home, just because he came home from work, that he had an interest in the business that he worked for? Well, the sensible implication, it seems to me, in the inference from that is that they would have talked about it. He could have been a paid employee. Correct? She admitted it on cross-examination, R41 of the record, that she knew he owned an interest in it. This is a feigned issue, Your Honor, and I appreciate you asking about it. But she knew that. She knew he had an interest. She hadn't seen the balance sheet of the certified auditor or what have you, but she admitted she knew that. And Judge Parson relied very heavily on the fact that she first said she didn't and then she said she did. When he sold the business in 2014, before he filed for dissolution, did that profit come in and was it distributed as part of the marital? Why would it be? There was a prenuptial agreement that made it non-marital. It was his money. She had no claim whatsoever to it. Are there other business interests that he has that were never put into the pot because of the premarital agreement? There is no pot because of the premarital agreement. The premarital agreement says yours is yours, mine is mine. Whatever I get in the meantime is mine. Whatever you get in the meantime is yours. That's it. This is not a pot case. I don't know. You've answered my question. I appreciate it. Thank you very much. Anyone else? Counsel. I believe you had a question for me in regard to the jointly held assets and the proof thereof. Those appear on the financial disclosures or the property disclosures with the premarital agreement. They both disclosed an ownership interest in a car, and they both disclosed a checking account. I couldn't find the precise reference in the record, but I believe that Mrs. Woodrum testified that she was on Mr. Woodrum's. There was a joint checking account for the purpose of proving their cohabitation for the country club membership. Are they still in existence? They used to be. Sure. And I do know that Mrs. Woodrum did not have her own vehicle at the time of the dissolution. What happened to the vehicle and what proceeds there might have been from a fairly nice Mustang that was jointly owned should have been addressed by the court, and we were not given the opportunity to do that. That was my problem. There used to be one. There was one in the past, and there used to be a checking account in the past, but where were they then? So all I know is there used to be something in the past, but nothing in the present. That's my problem. Correct. And our problem was as well, and I think Mr. Tucker mischaracterized what happened at that final hearing in May of last year. He didn't go on to quote my explanation that all the proceedings up to that point had been focused on the issue of either temporary maintenance or prenuptial agreement. I submitted discovery requests. There were objections, and we ultimately settled on, for the purpose of the prenuptial agreement issue, the 2007 tax returns and the 2014 tax returns. There was no full disclosure. We weren't able to determine to what extent the business interests may have been supplementing the party's lifestyle to that point, all of which would be relevant to try to ferret out what Mrs. Woodrum is entitled to. There was a 14-year relationship, a 7-year marriage. Something happened during that point that she shouldn't walk away with less than she came in with, and that's essentially what the ruling was. Mr. Woodrum keeps what he keeps. And if he'd like to argue that, oh, no, Mrs. Woodrum got her half of the car back in 2010, well, he can argue that, but we haven't had the opportunity to present that to the trial court. And did you point that out to the judge below the – excuse me, Your Honor, but we're not done here yet. I attempted to. Oh, I did, and that's apparent in the transcript of the May 30th, I believe, the final proceeding where the judgment was entered. Yeah, May 30th, 2017. The judgment was entered just simply saying refer to the premarital agreement. On the issue of the temporary maintenance, we believe the trial court got it right. I think it's fairly clear when you read the language of the prenuptial agreement. It says the right to maintenance terminates upon dissolution of the marriage. That's what happened here. I don't think counsel argued his cross-appeal, and I don't think you found brief on it, did you? I did not. I felt that it was self-evident, so I will leave that to the discretion of the court. Counsel has one minute. Can you help me with the sale of the business in 2014? It was $200,000, am I correct? His 20% interest, from what we can tell from the tax returns, was sold for $350,000. So where is that money? Did he buy a yacht with it during the course of the marriage? We don't know. You don't know whether he bought another Camaro or Nova? Mr. Woodrum, there's been some suggestion, I think mostly by counsel, that it was plowed back into the business or it was really his father's money, not really his, although I don't know what kind of son takes a $350,000 tax hit for his dad. And if she's correct that money from his business was being used to pay for their household expenses, there's some commingling going on there. It seems like he wasn't getting a salary, but he was just taking or getting from the business. He claims that he was getting a salary. He did get a W-2. He also got K-1s. As I said, we weren't able to fully investigate the issue, but when we looked at his financial affidavit that he completed in doing this dissolution, there were basic things that were not included as his outputs. Okay. Thank you. Thank you, counsel. The court will take this matter under advisement and render a decision in the near future. At this time, we'll have our panel change. Thank you.